STATE OF NORTH CAROLINA v. JOHNNIE B. HANKERSON

No. 56

(Filed 17 December 1975)

1. **Criminal Law § 90— State's introduction of exculpatory statements by defendant**

    The State is not bound by the exculpatory portions of a confession which it introduces in a homicide case if there is other evidence tending to throw a different light on the circumstances of the homicide.

2. **Homicide § 21— second degree murder — exculpatory statements — sufficiency of evidence for jury**

    The State's evidence was sufficient for the jury in this prosecution for second degree murder, notwithstanding the State introduced exculpatory statements by defendant that he shot the victim while the victim was reaching into defendant's car with a knife at defendant's throat and a hand on his chest, where the State's evidence cast doubt on defendant's version by tending to show that (1) defendant fled the scene at a great rate of speed; (2) defendant originally lied about the gun used in the shooting and told the truth about it after his wife turned it in to the police; (3) deceased had no grease on his hands although defendant claimed a grease spot on his shirt was from being grabbed by the victim; (4) the victim was found with a cigarette in one hand although defendant contended the victim used two hands against him; (5) the victim was right handed and defendant claimed the victim wielded the knife with his left hand; (6) defendant said he was stopped by two persons while the State's evidence was that the victim was alone; and (7) the victim had never been seen with a knife similar to one recovered from defendant's vehicle.

3. **Criminal Law § 86— prior misconduct — question in good faith**

    Defendant failed to show that the district attorney's question to him on cross-examination as to how many people he had shot before was asked in bad faith.

4. **Criminal Law § 162— failure to strike testimony — absence of motion to strike**

    The trial court did not err in failing to strike defendant's testimony regarding prior arrests which did not result in conviction where there was no motion to strike such testimony.

**5. Criminal Law § 113— recapitulation of evidence — misstatement — collateral matter**

    The trial court's inaccurate statement during recapitulation of the evidence in a homicide case that defendant testified he had been convicted of assault was a misstatement upon a collateral matter and not a ground for a new trial since no request for correction was made before the case was submitted to the jury.

**6. Homicide § 28— final mandate — absence of acquittal by self-defense — additional instructions**

    In this homicide prosecution, the trial court's error in failing to include in its final mandate the theory of acquittal by reason of self-defense was cured by additional instructions given by the court after the jury had begun its deliberations.

**7. Homicide §§ 14, 24— absence of malice — self-defense — burden of proof on defendant — unconstitutionality — nonretroactivity**

    Under the decision of *Mullaney v. Wilbur*, 421 U.S. 684 (1975), the Due Process Clause of the Fourteenth Amendment prohibits the use of our long-standing rules in homicide cases that, in order to rebut the presumption of malice, defendant must prove to the satisfaction of the jury that he killed in the heat of a sudden passion, and in order to rebut the presumption of unlawfulness, defendant must prove to the satisfaction of the jury that he killed in self-defense. However, the *Mullaney* decision is not retroactive and applies only to trials conducted on or after 9 June 1975.

**8. Homicide §§ 14, 24— presumption of malice and unlawfulness — constitutionality**

    The *Mullaney* decision does not preclude use of the presumptions of malice and unlawfulness upon proof beyond a reasonable doubt of a killing by the intentional use of a deadly weapon; nor does it prohibit making the presumptions mandatory in the absence of contrary evidence or permitting the logical inferences from facts proved to remain and be weighed against contrary evidence if it is produced.

    Justice LAKE concurring in result.

APPEAL by defendant pursuant to N. C. Gen. Stat. 7A-30(2) to review the decision of the Court of Appeals reported in 26 N.C. App. 575, 217 S.E. 2d 9 (1975), which found no error, *Arnold, J.,* dissenting, in the trial before *Webb, J.,* at the November 21, 1974 Session of NASH County Superior Court.

After the appeal was filed in this Court on July 31, 1975, defendant moved to amend the record on August 19, 1975, to note additional exceptions and assignments of error which would raise for review additional questions suggested by *Mullaney v. Wilbur,* 421 U.S. 684, decided on June 9, 1975. This motion was allowed on September 2, 1975, and the case argued on September 10, 1975.

Defendant was charged with the second degree murder of Gregory Ashe and entered a plea of not guilty. It was stipulated that had Dr. D. E. Scarborough, who performed the postmortem examination, been present at trial he would have testified that Gregory Ashe died on September 29, 1974, as a result of massive hemorrhage resulting from a gunshot wound to the heart.

Evidence for the State tended to show that on the night of September 29, 1974, Lorenzo Dancy, Wilbert Whitley, and the deceased, Gregory Ashe, left a dance hall and drove to a poolroom in Whitakers. Ashe was driving his car. Upon arrival at the poolroom, they discovered that it was closed. Ashe was unable then to restart his car. Ashe asked Dancy and Whitley for a match to light a cigarette. Neither had a match. Whitley announced that he was going to his home, one block away, and began walking. Dancy and Ashe were also walking away from the car when Ashe said that he was going back to "crank" the car. Dancy indicated that he was going on with Whitley. Dancy testified that he yelled for Whitley to wait and then proceeded to walk after Whitley. When last seen alive by Dancy, Ashe was seen walking alone back towards his car.

Moments later Dancy and Whitley each heard a gun fire. Dancy heard Ashe exclaim that he was shot and hollered this information to Whitley. A yellow and black Plymouth "Satellite" was observed pulling away at a fast rate of speed. It did not stop when it reached the nearby intersection of U. S. 301. Dancy and Whitley had differing accounts of whether the car left before or after Dancy hollered.

The shooting had occurred some time after 11:00 o'clock. Because of the darkness it was difficult to find Ashe. Around 12:00 o'clock, Ashe was discovered lying face down in a field about thirty feet from the road. A cigarette, which had been lit but which was now out, was in Ashe's hand. The body was removed at 4:00 or 5:00 o'clock that morning.

After determining the identity of the owner of the Plymouth, several law enforcement officers, including Deputy Sheriff M. M. Reams went to defendant's home, advised defendant of his rights, and questioned him. Defendant told Deputy Reams that he had been to Whitakers, had shot a person who had grabbed him and tried to cut his throat but did not know whether he had hit him. Reams testified that defendant's car was

searched with his consent and a knife was found in the middle of the front seat. Also found in the car was a ".30-06," ammunition for the ".30-06," and a hunting knife. Blood was observed on the driver's side of the car, just behind the door. Defendant gave Reams a shirt with a grease spot and stated that was where he had been grabbed. When asked about the pistol used in the shooting *(not* the ".30-06"), defendant told Reams that he was "in the process of buying" it but had already returned it to the seller, whom he refused to identify.

On cross-examination Reams gave this additional account of defendant's statements: Defendant was driving his Plymouth "Satellite" automobile near the poolroom when a man stopped him and asked him for a light. Defendant gave the man the cigarette lighter from the dash of his automobile. Defendant felt someone "shaking the car, shaking the right door that was locked." Defendant put the cigarette lighter back in the holder and when he turned around "the man" was reaching in with a knife at his throat and had a hand on defendant's chest. Defendant reached down, got a revolver, and "shot the man who already had his hand on his left chest."

Officer Reams also testified that after taking defendant's statement he returned to the morgue and examined the deceased's hands. He found no grease on them. Several witnesses for the State testified that they had never seen the deceased with a knife like the one in evidence found in defendant's car.

Defendant testified giving the following account of the incident: He was driving his Plymouth automobile slowly over a road containing large holes when someone asked for a light. Through his car mirror, defendant could see two men. One of them walked up to the car and defendant reached over to the dash of the car, pushed in the cigarette lighter, and gave the lighter to him. On returning the lighter to its holder, defendant felt the car move, and looked and noticed the second man standing on the right-hand side of the car. As he turned back to his left, the first man reached into his car, seized him by the left shoulder with his right hand and put a knife to defendant's throat with his left hand. Defendant felt the knife at his throat, grabbed his gun and shot. He surmised that his assailant dropped his knife in the car since it did not belong to the defendant.

Defendant admitted that he lied to the police about the whereabouts of the gun. He said:

"The pistol was in my house at the time the law came there. He did ask me for the pistol then. I told him I had returned it to the person I got it from. I had not returned it. It was in the house right then.

\* \* \* \*

"The reason I didn't tell the Sheriff the truth about where the pistol was was because at that time I just wasn't thinking, but after I got up here in jail I decided I might as well go ahead and tell them. My wife had already given it to the officers at that time. It is true that I never told them where the pistol was. If they had wanted to search the house they could have found it right there under the mattress. I did not hide the gun. That was just to keep it away from the children."

Defendant's wife, however, testified that she got the pistol from defendant's drawer where "I am sure he put it."

In rebuttal the State introduced evidence that Gregory Ashe was right-handed.

The jury found defendant guilty of second degree murder. He was sentenced to not less than 20 nor more than 25 years imprisonment. The Court of Appeals found no error, Arnold, J., dissenting.

*Rufus L. Edmisten, Attorney General, by Claude W. Harris, Assistant Attorney General, for the State.*

*L. G. Diedrick, W. O. Rosser and Roland Braswell, Attorneys for defendant appellant.*

EXUM, Justice.

I

Defendant assigns as error the denial of his motions for judgment as of nonsuit. Judge Arnold's dissent was on the basis that nonsuit should have been allowed. Reviewing this assignment, we consider all of the evidence actually admitted, whether from the State or defendant, in the light most favorable to the State, resolve any contradictions and discrepancies therein in the State's favor, and give the State the benefit of all reasonable inferences from the evidence. *State v. Cutler,* 271 N.C.

379, 382, 156 S.E. 2d 679, 681 (1967). Defendant more specifically urges that this case comes within the rule that, "[w]hen the State introduces in evidence exculpatory statements of the defendant which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound by these statements. While the intentional killing of another with a deadly weapon raises the presumption that the killing was unlawful and done with malice, this rule of law does not mean that the burden of showing an unlawful killing does not rest with the State. When the State's evidence and that of the defendant are to the same effect and tend only to exculpate the defendant, motion for nonsuit should be allowed. *State v. Carter,* 254 N.C. 475, 119 S.E. 2d 461." *State v. Johnson,* 261 N.C. 727, 730, 136 S.E. 2d 84, 86 (1964).

In *State v. Johnson, supra,* a murder prosecution, the State's only evidence that defendant committed a homicide was a confession that established a perfect self-defense. Circumstantial evidence corroborated the confession. Defendant's evidence at trial was to the same effect. In this context we held defendant entitled to a nonsuit and reversed a conviction for manslaughter. *State v. Carter, supra,* presented basically the same situation. There was no evidence which tended to contradict or impeach defendant's confession or testimony at trial that she acted lawfully in the defense of another.

[1] The State contends, however, and we agree that this case falls more squarely within the rule that the State is not bound by the exculpatory portions of a confession which it introduces, if there is "other evidence tending to throw a different light on the circumstances of the homicide." *State v. Bright,* 237 N.C. 475, 477, 75 S.E. 2d 407, 408 (1953); see also *State v. Bolin,* 281 N.C. 415, 189 S.E. 2d 235 (1972) and *State v. Cooper,* 273 N.C. 51, 159 S.E. 2d 305 (1968). In *State v. Bright, supra,* the State introduced defendant's statement that he killed his wife accidentally while they were scuffling on the bed. We held, however, that evidence "such as the absence of powder burns, the location and direction of the fatal wound, [and] the conduct of the defendant . . ." was sufficient to survive a motion for nonsuit, and we affirmed a manslaughter conviction.

[2] We hold that nonsuit in this case was properly denied in view of evidence which casts doubt on defendant's version of the incident. This evidence is to the effect that: (1) defendant fled the scene at a great rate of speed; (2) defendant originally

lied about the gun and decided to tell the truth about it after his wife had turned it in to the police; (3) the deceased had no grease on his hands although defendant claimed the grease spot on his shirt was from being grabbed by the deceased; (4) the deceased was found with a cigarette in one hand, although defendant claims the deceased used two hands against him; (5) the deceased was right-handed although defendant claims that deceased wielded the knife with his left hand; (6) defendant says he was stopped by two persons while the State's evidence was that the deceased, when last seen alive moments before the shooting, was alone; (7) the deceased had never been seen with a knife in his possession similar to the one recovered from defendant's vehicle.

While none of these circumstances taken individually flatly contradicts defendant's statement, taken together they are sufficient to "throw a different light on the circumstances of the homicide" and to impeach the defendant's version of the incident. The State is not bound, therefore, by the exculpatory portions of defendant's statement. The case is for the jury.

## II

On cross-examination of the defendant by the district attorney the following occurred:

"Q. How many people have you ever shot before?

OBJECTION: OVERRULED: EXCEPTION

DEFENDANT'S EXCEPTION NO. 3.

Q. Go ahead and tell us exactly how many?

A. I have shot one.

Q. Is that all?

A. Two.

Q. Is that all?

A. Yes."

As the cross-examination continued without further objection defendant admitted having been "convicted of whiskey" and "convicted one time of escaping from prison. . . . I have not been convicted of anything else. I have been up once before in North Carolina for assault; this is the second time. That was

for shooting. It was in self-defense. I came clear of that." On recross-examination the defendant testified: "I have not been previously convicted of assault. They kept me in jail three or four nights the time the man was hitting me with a stick. Years back a fellow whacked me with a knife and he was shot in the leg but I didn't go to jail for it. I just paid his hospital bill." Apparently with reference to this testimony the trial judge, summarizing the evidence, stated to the jury that the defendant "testified that he had once been convicted of escape and once he was convicted of assault, and you will recall the things he said he had been convicted for."

Defendant now assigns as error: first, the overruling of his objection to the district attorney's question, "How many people have you ever shot before?"; second, failure of the court to strike "defendant's testimony as to any prior arrests that did not result in a conviction"; and third, the statement of the trial judge hereinabove set out recapitulating the testimony of the defendant.

[3] With regard to the district attorney's question defendant properly concedes the right of the State to cross-examine defendant as to specific acts of misconduct, *State v. Gainey,* 280 N.C. 366, 185 S.E. 2d 874 (1972), and properly concedes that unlawfully shooting other people would be such misconduct. Defendant contends, however, that the question was patently asked in bad faith since the district attorney must have been aware that the defendant was acquitted of that charge. Defendant, however, testified that he had shot people on *two* other occasions only one of which resulted in an acquittal by reason of self-defense. There is no showing in the record that the district attorney in fact knew the official outcome of these assaults. Apparently one of them never came to trial.

[4] As to the trial judge's failure to strike defendant's testimony regarding prior arrests which did not result in convictions, suffice it to say there was no motion to strike any of this testimony. Apparently defendant was satisfied at trial with his full explanation before the jury of the outcome of the two shooting incidents. The trial judge was not required, *sua sponte,* to strike this testimony. *State v. Battle,* 267 N.C. 513, 148 S.E. 2d 599 (1966).

[5] Although defendant admitted he paid hospital bills for one of his victims, he said also that he "didn't go to jail for

it" and that he had "not previously been convicted of assault." The trial judge did, it seems, inaccurately recapitulate the defendant's testimony on this point. The misstatement is understandable. Nevertheless "inaccurate statements of this character are not ground for a new trial unless called to the court's attention with request that correction be made before the case is submitted to the jury." *State v. Revis,* 253 N.C. 50, 53, 116 S.E. 2d 171, 174 (1960). In *State v. Cantrell,* 230 N.C. 46, 51 S.E. 2d 887 (1949) relied on by defendant on this point, defendant was tried on a charge of carnally knowing his ten year old child. In dictum this Court volunteered the observation that it would have been error for the trial judge to say, in recapitulating the evidence, that defendant "admitted . . . he had been tried and convicted of an assault with intent to commit rape on his daughter Dorline Shelton" unless such an admission appeared in the record. (It does not appear in the opinion but the record reveals that Dorline Shelton was not the prosecutrix, but another daughter of the defendant.) Noting that no exception was taken or assignment of error directed to this portion of the charge, this Court recognized that the defendant may indeed have made such an admission although none appeared in the record. Assuming the correctness of this dictum, the supposed misstatement there considered is clearly distinguishable from the one here. In prosecutions for various kinds of illicit sexual activity, our decisions have been characterized as being "markedly liberal in holding evidence of similar sex offenses admissible" on the question of guilt. 1 Stansbury's North Carolina Evidence 299 (Brandis Rev. 1973). It might then be considered that the assumed misstatement in *Cantrell* was one of a fact bearing directly on defendant's guilt. This Court has said that "a statement of a material fact not shown in the evidence constitutes reversible error" whether or not called to the trial court's attention. *State v. McCoy,* 236 N.C. 121, 124, 71 S.E. 2d 921, 923 (1952). The misstatement here complained of was clearly upon a collateral matter.

These assignments of error are, consequently, overruled.

### III

[6] In his final mandate the trial judge failed to reiterate and specify that self-defense was a possible theory of acquittal. Defendant contends that under *State v. Dooley,* 285 N.C. 158, 203 S.E. 2d 815 (1974) this is reversible error. After the jury had been deliberating approximately forty-five minutes, how-

ever, they returned to the courtroom to ask for clarification on the distinction between manslaughter and murder in the second degree. In the course of his instructions responsive to this inquiry the trial judge charged in addition as follows:

> "Also, I want to instruct you that the charge I gave you as to self-defense would apply equally to manslaughter as it would to second degree murder in that if you find the defendant was justified or excused in the killing because he was acting in self-defense then you would find him not guilty as to either one."

While *Dooley* does require the trial judge to include in his final mandate the theory of acquittal by reason of self-defense where it has been raised by the evidence, failure here to do so was cured, in our opinion, by the additional instructions. *State v. Brooks,* 225 N.C. 662, 36 S.E. 2d 238 (1945). Certainly the additional instructions render any error of omission in the final mandate harmless beyond a reasonable doubt.

## IV

On June 9, 1975, the United States Supreme Court decided *Mullaney v. Wilbur,* 421 U.S. 684, which held that a Maine jury instruction requiring a defendant being tried for murder to prove by a preponderance of the evidence, in order to reduce the murder to manslaughter, that he acted in the heat of passion on sudden provocation, violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as that clause was interpreted in *In re Winship,* 397 U.S. 358 (1970) to require the prosecution to prove beyond a reasonable doubt every fact necessary to constitute a crime. It was subsequently re-explained in *Faretta v. California,* 422 U.S. 806, n. 15 (1975) that the right of the defendant to have this burden placed on the State, though not literally expressed in any particular provision of the Constitution, was essential to due process of law in a fair adversary process.

Defendant contends that under the rationale of *Mullaney* the trial judge's instructions to the jury in this case violate Fourteenth Amendment Due Process. While the trial judge in defining second degree murder and manslaughter and in his final mandate to the jury placed upon the State the burden to prove beyond a reasonable doubt both malice and unlawful-

ness, i.e., without justification or excuse, he also instructed the jury, in pertinent part, as follows:

> "*If the State proves beyond a reasonable doubt or it is admitted that the defendant intentionally killed Gregory Ashe with a deadly weapon, or intentionally inflicted a wound upon Gregory Ashe with a deadly weapon, that proximately caused his death, the law raises two presumptions; first, that the killing was unlawful, and second, that it was done with malice. Then, nothing else appearing, the defendant would be guilty of second degree murder.* . . .

> "As I told you, you will have to either find the defendant guilty of second degree murder or manslaughter or not guilty. *In order to reduce the crime from second degree murder to manslaughter, the defendant must prove not beyond a reasonable doubt but simply to your satisfaction that there was no malice on his part. And in order to excuse his act altogether on the grounds of self-defense, the defendant must prove not beyond a reasonable doubt but simply to your satisfaction that he acted in self-defense.* And I will charge you on self-defense in just a moment. But I do want to charge you that *to negate malice and thereby reduce the crime to manslaughter, the defendant must satisfy you of three things:* first, that he shot Gregory Ashe in the heat of a passion. . . . The second thing he must satisfy you of is that this passion was provoked by acts of Gregory Ashe which the law regards as adequate provocation. . . . And thirdly, that the shooting took place so soon after the provocation that the passion of a person of average mind and disposition would not have cooled.

> "*To excuse the killing entirely on the grounds of self-defense . . . the defendant must satisfy you of four things:* first, that it appeared to the defendant and he believed it to be necessary to shoot Gregory Ashe in order to save himself from death or great bodily harm. . . . The second thing that you must be satisfied of—excuse me—that the defendant must satisfy you of is this, that the circumstances as they appeared to him at the time were sufficient to create such belief in the mind of a person of ordinary firmness. . . . And the third thing the defendant must satisfy you of is that he was not the aggressor. . . . And the fourth thing that the defendant must satisfy you of is that he did not use excessive force. . . .

State v. Hankerson

"If you find that the defendant acted properly in self-defense, he would not be guilty. However, if the defendant though otherwise acting in self-defense used excessive force, the defendant would be guilty of voluntary manslaughter." (Emphases supplied.)

[7] We hold that by reason of the decision in *Mullaney* the Due Process Clause of the Fourteenth Amendment prohibits the use of our long-standing rules in homicide cases that a defendant in order to rebut the presumption of malice must prove to the satisfaction of the jury that he killed in the heat of a sudden passion and to rebut the presumption of unlawfulness, that he killed in self-defense. The instructions given here insofar as they placed these burdens of proof on the defendant violate the concept of due process announced for the first time in *Mullaney*. We decline, however, for reasons hereinafter stated, to give *Mullaney* retroactive effect in North Carolina. We hold that because the trial judge instructed the jury in accordance with our law of homicide as it stood, and in a trial conducted, before the *Mullaney* decision, the defendant is not entitled to the benefit of the *Mullaney* doctrine. We will, however, apply the decision to all trials conducted on or after June 9, 1975.

The law of Maine and the precise issue it presented was succinctly stated by the Supreme Court in *Mullaney*:

"*Absent justification or excuse, all intentional or criminally reckless killings are felonious homicides. Felonious homicide is punished as murder—i.e., by life imprisonment—unless the defendant proves by a fair preponderance of the evidence that it was committed in the heat of passion on sudden provocation,* in which case it is punished as manslaughter—i.e., by a fine not to exceed $1,000 or by imprisonment not to exceed 20 years. The issue is whether the Maine rule requiring the defendant to prove that he acted in the heat of passion on sudden provocation accords with due process." 421 U.S. at 691-92. (Emphasis supplied.)

A portion of the trial judge's instructions to the jury in Maine were summarized in *Mullaney* as follows:

"[*T*]*hat if the prosecution established that the homicide was both intentional and unlawful, malice aforethought was to be conclusively implied unless the defendant proved by a fair preponderance of the evidence that he acted in*

*the heat of passion on sudden provocation.* The court emphasized that *'malice aforethought and heat of passion on sudden provocation are inconsistent things.'* [Appendix to the Record] at 62; thus, by proving the latter the defendant would negate the former and reduce the homicide from murder to manslaughter. The court then concluded its charge with elaborate definitions of 'heat of passion' and 'sudden provocation.' " *Id.* at 686-87. (Emphases supplied.)

Maine's conclusive implication of malice which arose from proof of an unlawful and intentional killing meant simply that upon proof of these things the defendant was guilty of murder unless the defendant proved by a fair preponderance of the evidence that he acted in heat of passion on sudden provocation where the issue of heat of passion was raised. Thus Maine's law under these circumstances relieved the State of the burden of proving both malice and the absence of heat of passion. In this the Supreme Court found that due process was wanting. It said:

"Maine law requires a defendant to establish by a preponderance of the evidence that he acted in the heat of passion on sudden provocation in order to reduce murder to manslaughter. Under this burden of proof a defendant can be given a life sentence when the evidence indicates that it is *as likely as not* that he deserves a significantly lesser sentence. This is an intolerable result in a society where, to paraphrase Mr. Justice Harlan, it is far worse to sentence one guilty only of manslaughter as a murderer than to sentence a murderer for the lesser crime of manslaughter. *In re Winship,* 397 U.S. at 372 (concurring opinion). We therefore hold that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." *Id.* at 703-704.

In North Carolina, our law of homicide pertinent to the questions here raised has not been substantially changed since it was enunciated in 1864 in *State v. Ellick,* 60 N.C. 450. This Court there said:

"When it is proved that one has killed intentionally, with a deadly weapon, the burthen of showing justification, excuse or mitigation, is upon him." *Id.* at 459.

\*   \*   \*   \*

". . . the fact of the homicide must be proved *by the State;* but if found or admitted, the *onus* of showing justification, excuse or mitigation, is upon the *prisoner." Id.* at 462.

The Court in *Ellick* concluded its opinion by saying that any fact which the State is required to establish must be proved beyond a reasonable doubt; but as to facts which the prisoner is required to establish, the jury must be satisfied by the testimony that they are true. *Ellick* has been cited as authoritative in *State v. Phillips,* 264 N.C. 508, 515, 142 S.E. 2d 337, 341 (1965) and *State v. Creech,* 229 N.C. 662, 673, 51 S.E. 2d 348, 357 (1949).

Another of our early cases on the subject was *State v. Willis,* 63 N.C. 26 (1868), which while holding that the defendant need not prove mitigation or justification by a preponderance of the evidence, nevertheless approved the following instruction given by the trial judge:

"[W]hen it is proved or admitted that one killed another intentionally, with a deadly weapon, the burden of showing justification, excuse or mitigation is on him, and all the circumstances of such justification, excuse or mitigation are to be satisfactorily proved by him, unless they appear in the evidence against him; that the fact of killing being proved or admitted, nothing more appearing, the law presumes such killing to have been done in malice, and so to be murder; that the circumstances of justification, excuse or mitigation, are to be *satisfactorily* proved, not proved as the State is required to prove an essential fact, that is beyond a reasonable doubt, for the doctrine of reasonable doubt is never applied to the condemnation of a prisoner, but to his acquittal; and that the jury must be satisfied by the testimony offered in the case on either side that the matter in justification, excuse or mitigation is true." *Id.* at 26-27. (Emphasis supplied.)

The Court said further:

"We prefer to stand *super antiquas vias,* and to adhere to the rules laid down in the *State v. Ellick,* above referred to. In that case the erroneous statement which we had inadvertently made in the *State v. Peter Johnson,* [48 N.C. 266 (1855)] that it was incumbent on the prisoner to establish the matters of excuse or extenuation beyond a

State v. Hankerson

reasonable doubt, is corrected. In it is also corrected what we consider as erroneous in the decision of the Court in *Commonwealth v. York* [9 Met. (50 Mass.) 93 (1845)], that the matters of excuse or extenuation which the prisoner is to prove, must be decided according to the preponderance of evidence. It is more correct to say, as we think, that they must be proved to the satisfaction of the jury." *Id.* at 29.

In *State v. Vann*, 82 N.C. 631, 635 (1880), Justice Dillard, elucidating the law laid down in *Ellick* and *Willis*, wrote:

"In an indictment for murder, the two constituents of the crime, to-wit, a voluntary killing and malice aforethought, must be proved by the state, as it makes the charge; and as the accused is presumed to be innocent until the contrary is shown, both of these elements must be proved. The killing being shown, then the other ingredient, malice prepense, is also proved as a fact in the eyes of the law, not by evidence adduced, but by a presumption that the law makes from the fact of the killing. And these two essential facts being thus established, the legal conclusion thereon is, that the offense charged is murder. (Citations omitted.)

"But the implication of malice, made by the law and taken as a fact, is not conclusive on the party accused, but may be rebutted. He may show, if he can, by his proofs, that there was no malice prepense and thereby extenuate to manslaughter, or make a case of justifiable or excusable homicide, or a case of no criminality at all by proof of insanity at the time of the act committed, disabling him to know right from wrong. (Citations omitted.) *The burden lies on the accused to make these proofs, if he can; otherwise, the conclusion of murder, on a malice implied, will continue against him and will call for, and in law, oblige a conviction by the jury.*" (Emphasis supplied.)

In *State v. Miller*, 112 N.C. 878, 885, 17 S.E. 167, 169 (1893), the Court pointed out "that when the killing with a deadly weapon is proved and admitted the burden is shifted upon the prisoner, and he must satisfy the jury, if he can do so from the whole of the testimony, as well that offered for the State as for the defense, that matter relied on to show mitigation or excuse is true."

These early cases were decided before the enactment of N. C. Pub. Laws 1893, ch. 85 (now N. C. Gen. Stat. 14-17), which divided murder into two degrees. This act made certain specified kinds of murder, including a deliberate and premeditated killing, murder in the first degree. All other kinds of murder were made by the statute murder in the second degree. *State v. Benton,* 276 N.C. 641, 657, 174 S.E. 2d 793 (1970). Homicide cases decided subsequent to this statute continued to sanction the presumptions of unlawfulness and malice but refused to recognize any presumption of premeditation or deliberation. *State v. Brown,* 249 N.C. 271, 106 S.E. 2d 232 (1958) ; *State v. Absher,* 226 N.C. 656, 40 S.E. 2d 26 (1946) ; *State v. Keaton,* 206 N.C. 682, 175 S.E. 296 (1934) ; *State v. Rhyne,* 124 N.C. 847, 33 S.E. 128 (1899) ; *State v. Fuller,* 114 N.C. 885, 19 S.E. 797 (1894). Modern, accurate and sufficient statements of the rules regarding these presumptions may be found in *State v. DuBoise,* 279 N.C. 73, 181 S.E. 2d 393 (1971) ; *State v. Winford,* 279 N.C. 58, 181 S.E. 2d 423 (1971).

The foregoing authorities establish that from 1864 to 1975, 111 years, the law of this State has been this: when it is established by a defendant's judicial admission, or the State proves beyond a reasonable doubt that the defendant intentionally inflicted a wound upon the deceased with a deadly weapon which proximately caused death, the law raises two presumptions against the defendant: (1) the killing was unlawful, and (2) it was done with malice. Nothing else appearing in the case the defendant would be guilty of murder in the second degree. When these presumptions arise the burden devolves upon the defendant to prove to the satisfaction of the jury the legal provocation which will rob the crime of malice and reduce it to manslaughter or which will excuse the killing altogether on the ground of self-defense. If defendant rebuts the presumption of malice only, the presumption that the killing was unlawful remains, making the crime manslaughter. The jury instructions complained of here were in accordance with these long established rules.

This Court has never defined precisely what is meant by "satisfying" the jury. It has been clear, however, from the earliest cases that satisfying the jury meant something other than persuading beyond a reasonable doubt and persuading by a preponderance of the evidence. *State v. Freeman,* 275 N.C.

662, 170 S.E. 2d 461 (1969) ; *State v. Barrett,* 132 N.C. 1005, 43 S.E. 832 (1903). This Court said in *Barrett:*

> "[T]he prisoner must satisfy the jury, neither by a reasonable doubt nor yet by a preponderance of the evidence, but simply satisfy them, of the existence of facts and circumstances which mitigate the offense or which make good a plea of self-defense."

Satisfying the jury, the standard long adopted by this Court and utilized in the instructions now under consideration means, we believe, a standard no greater and at the same time one not significantly less than persuasion by a preponderance of the evidence. Satisfying the jury means that there must be some evidence offered of all elements of heat of passion on sudden provocation or of self-defense, as the case may be, and that this evidence must satisfy or persuade the jury of the truth of the existence of these provocations—one which robs the crime of malice and the other which excuses it altogether.

Under the Maine rules considered in *Mullaney* when the State proved beyond a reasonable doubt that the killing was (1) intentional, and (2) unlawful, the jury was told that the defendant would be guilty of murder unless he proved by a preponderance of the evidence that he killed in the heat of passion in which case he could be convicted only of manslaughter. Under North Carolina rules when the State proved beyond a reasonable doubt a killing proximately resulting from the intentional use of a deadly weapon the jury here was told, in effect, that defendant would be guilty of murder in the second degree unless he "satifies" the jury that he killed in the heat of sudden passion or in self-defense. The instructions here under consideration, therefore, like those in Maine, unconstitutionally relieved the prosecution of the burden of proving beyond a reasonable doubt malice and unlawfulness when the issues of their existence were properly raised.

We note that there is no evidence in this case of a killing in the heat of passion on sudden provocation. Therefore this issue is not "properly presented" as it was in *Mullaney.* There could not, consequently, be any *Mullaney* error prejudicial to defendant on this aspect of the case.

As a matter of state law, however, and as the jury was instructed here, our rules allocating burden of proof on self-defense and heat of passion are the same. As early as 1868 this

Court in *State v. Willis, supra* at 29-30 said, "In the proof of such matters we do not recognize any distinction between the case where the question is whether the homicide is murder or manslaughter, and that where it is whether the killing is murder or excusable or justifiable homicide." There is in this case evidence of self-defense. The issue regarding its existence is properly presented. For the guidance of our trial judges, consequently, and inasmuch as there are jury instructions given here as if there were evidence of a heat of passion killing, we have dicussed the matter as if such evidence were indeed present.

It is also true that the trial judge did near the beginning and at the end of his instructions tell the jury that the State had the burden to prove beyond a reasonable doubt both malice and unlawfulness. We are cognizant of the federal rule that jury instructions must be considered contextually in determining whether there is error of federal constitutional dimension. *Cupp v. Naughten*, 414 U.S. 141 (1973). Considering the entire instruction contextually we believe it must have meant this to the jury in this case: the state as a matter of abstract principle was required to prove each element of the offense charged, including malice and unlawfulness, beyond a reasonable doubt. If, however, an intentional killing with a deadly weapon was so proved (defendant here admitted this much) a presumption arises which even in the presence of evidence of a justifiable, and hence, lawful, homicide nevertheless relieves the state of proving unlawfulness and requires the jury to find the defendant guilty unless this evidence satisfies it of the truth of defendant's contention that he did kill in self-defense.

[8] The *Mullaney* ruling does not, however, preclude all use of our traditional presumptions of malice and unlawfulness. It precludes only utilizing them in such a way as to relieve the state of the burden of proof on these elements when the issue of their existence is raised by the evidence. The presumptions themselves, standing alone, are valid and, we believe, constitutional. *State v. Williams*, 288 N.C. 680, 220 S.E. 2d 558 (1975) ; *State v. Sparks*, 285 N.C. 631, 207 S.E. 2d 712 (1974), pet. for cert. filed, 43 U.S.L.W. 3392 (U.S. Nov. 29, 1974) (No. 669). Neither, by reason of *Mullaney*, is it unconstitutional to make the presumptions mandatory in the absence of contrary evidence nor to permit the logical inferences arising from facts proved (killing by intentional use of deadly weapon), *State v. Williams, supra*, to remain and be weighed against contrary evidence if

it is produced. The effect of making the presumptions mandatory in the absence of any contrary evidence is simply to impose upon the defendant a burden to go forward with or produce some evidence of all elements of self-defense or heat of passion on sudden provocation, or rely on such evidence as may be present in the State's case. The mandatory presumption is simply a way of stating our legal rule that in the absence of evidence of mitigating or justifying factors all killings accomplished through the intentional use of a deadly weapon are deemed to be malicious and unlawful. The prosecution need not prove malice and unlawfulness unless there is evidence in the case of their nonexistence. *Cf.* McCormick, Evidence § 346, n. 91 (2d Ed. 1972). We find this perceptive language in G. Fletcher, "Two Kinds of Legal Rules: A Comparative Study of Burden-of-Persuasion-Practices in Criminal Cases," 77 Yale L.J. 905 (1968) (cited in *Mullaney v. Wilbur, supra,* n. 16) :

> "The critical step in the conceptual evolution of malice is *MacKally's Case.* [9 Co. Rep. 65b, 77 Eng. Rep. 828 (1611)]. That early 17th century decision, as reported and interpreted by Coke, stands for the principle that the prosecution need not prove the element of malice to convict of murder. The judges realized that malice does not lend itself to affirmative proof; by and large, the malicious killing is defined by reference to what it is not, not by what it is. As agreed by all, one type that was not malicious was a killing provoked by a sudden quarrel. Thus, to have a triable issue of malice, one had to have a triable claim that the defendant killed in the course of a sudden quarrel."

The same, we believe, may be said of the element of unlawfulness. There is no suggestion in *Mullaney* that placing such a burden of producing evidence upon a defendant violates Fourteenth Amendment Due Process. "Many States do require the defendant to show that there is 'some evidence' indicating that he acted in the heat of passion before requiring the prosecution to negate this element by proving the absence of passion beyond a reasonable doubt. (Citations omitted.) Nothing in this opinion is intended to affect that requirement." *Mullaney v. Wilbur, supra,* n. 28.

If there is evidence tending to show all elements of heat of passion on sudden provocation or self-defense the mandatory presumption of malice and unlawfulness, respectively, disappear but the logical inferences remaining from the facts proved

may be weighed against this evidence. In *United States v. Barnes,* 412 U.S. 837 (1973), the Supreme Court said:

> "Of course, the mere fact that there is some evidence tending to explain a defendant's possession consistent with innocence does not bar instructing the jury on the inference. The jury must weigh the explanation to determine whether it is 'satisfactory'. . . . The jury is not bound to accept or believe any particular explanation any more than it is bound to accept the correctness of the inference. But the burden of proving beyond a reasonable doubt that the defendant did have knowledge that the property was stolen, an essential element of the crime, remains on the government."

*See United States v. Dube,* 520 F. 2d 250 (1st Cir. 1975) (Judge Campbell concurring.)

*Mullaney,* then, as we have interpreted it, requires our trial judges in homicide cases to follow these principles in their jury instructions: the State must bear the burden throughout the trial of proving each element of the crime charged including, where applicable, malice and unlawfulness beyond a reasonable doubt. The decision permits the state to rely on mandatory presumptions of malice and unlawfulness upon proof beyond a reasonable doubt that the defendant intentionally inflicted a wound upon the deceased with a deadly weapon which proximately resulted in death. If, after the mandatory presumptions are raised, there is no evidence of a heat of passion killing on sudden provocation and no evidence that the killing was in self-defense, *Mullaney* permits and our law requires the jury to be instructed that defendant must be convicted of murder in the second degree. If, on the other hand, there is evidence in the case of all the elements of heat of passion on sudden provocation the mandatory presumption of malice disappears but the logical inferences from the facts proved remain in the case to be weighed against this evidence. If upon considering all the evidence, including the inferences and the evidence of heat of passion, the jury is left with a reasonable doubt as to the existence of malice it must find the defendant not guilty of murder in the second degree and should then consider whether he is guilty of manslaughter. If there is evidence in the case of all the elements of self-defense, the mandatory presumption of unlawfulness disappears but the logical inferences from the facts proved may be weighed against this evidence. If upon

considering all the evidence, including the inferences and evidence of self-defense, the jury is left with a reasonable doubt as to the existence of unlawfulness it must find the defendant not guilty.

## V

This case was tried November 21, 1974; *Mullaney* was decided June 9, 1975. We decline, without further guidance from the Supreme Court, to give the decision retroactive effect. We believe and hope that the Supreme Court will eventually determine that the decision applies prospectively only. If such a determination is eventually made by the Supreme Court not only would we not be required to apply its principles to the case now before us, *Kaiser v. New York*, 394 U.S. 280 (1969); *Desist v. United States*, 394 U.S. 244 (1969), it seems that it would be considered error by the Supreme Court for us to do so. In *Michigan v. Payne*, 412 U.S. 47 (1973), the Michigan Supreme Court had rejected a higher sentence imposed upon a defendant convicted after a retrial than was imposed upon his first conviction as being violative of certain due process requirements established in *North Carolina v. Pearce*, 395 U.S. 711 (1969). The second sentence was imposed before the *Pearce* decision. In *Payne* the United States Supreme Court held that *Pearce* would not apply retroactively and it was, consequently, error for the Michigan Supreme Court to apply it to a sentencing proceeding which predated the decision although the question of the constitutionality of the higher sentence was pending before the Michigan Supreme Court when *Pearce* was decided. The judgment of the Michigan Supreme Court was reversed and the case remanded for further proceedings. *See also State v. Bullock*, 268 N.C. 560, 151 S.E. 2d 9 (1966) and *State v. Mills*, 268 N.C. 142, 150 S.E. 2d 13 (1966) where we declined to apply *Miranda v. Arizona*, 384 U.S. 436 (1966) to cases in which the trials were conducted before the decision but which were pending on appeal at the time the decision came down, on the authority of *Johnson v. New Jersey*, 384 U.S. 719 (1966).

While *Mullaney* relied heavily on *Winship* and *Winship* was held to be retroactive in *Ivan V. v. City of New York*, 407 U.S. 203 (1972), it does not necessarily follow that *Mullaney* will be given retroactive effect.

In determining whether a new rule of constitutional proportions is given retroactive effect the Supreme Court seems

to have considered three factors. The most important factor seems to have been the purpose to be served by the new rule. If the rule is designed to protect the reliability of the fact finding process and "the constitutional error presents a serious risk that the issue of guilt or innocence may not have been reliably determined" then it has been said that the decision will on this basis alone be given full retroactive effect. *Ivan V. v. City of New York, supra* (holding *In re Winship, supra,* retroactive) ; *Roberts v. Russell,* 392 U.S. 293 (1968) (holding *Bruton v. United States,* 391 U.S. 123 (1968) retroactive).

If the first factor is not determinative then the Supreme Court has considered two other factors: the extent of reliance on previous decisions, *Tehan v. United States ex rel. Shott,* 382 U.S. 406 (1966), even though the new rule may have been "foreshadowed" by intervening cases, *Desist v. United States, supra* at 248, and the effect on the administration of justice of retroactive application, *Id.* at 251, not only in the nation as a whole but within the particular jurisdictions affected. *Tehan v. United States ex rel. Shott, supra* at 418-419.

Although the first factor listed is clearly the most important, how that factor is approached by the Supreme Court seems sometimes to depend on analysis of the other two factors. *Compare Tehan v. United States ex rel. Shott, supra* (holding *Griffin v. California,* 380 U.S. 609 (1965) not retroactive), *with Stovall v. Denno,* 388 U.S. 293 (1967) (holding *United States v. Wade,* 388 U.S. 218 (1967) and *Gilbert v. California,* 388 U.S. 263 (1967) not retroactive). In holding *Griffin,* which declared unconstitutional the California practice of commenting on a defendant's failure to take the stand, not to be retroactive the Supreme Court in *Tehan* recognized that, although only six states would be affected by *Griffin,* almost every trial in those six states going back many years might have to be upset if *Griffin* were made retroactive. Noting such a devastating impact on the administration of justice, the Supreme Court said:

> "Those reaping the greatest benefit from a rule compelling retroactive application of *Griffin* would be [those] under lengthy sentences imposed many years before *Griffin.* Their cases would offer the least likelihood of a successful retrial since in many, if not most, instances, witnesses and evidence are no longer available." *Tehan v. United States ex rel. Shott, supra* at 418-419.

*Mullaney* and *Winship* are poles apart in terms of extent of reliance on previous rules and the effect on the administration of justice of retroactive application. It seems clear that the Supreme Court saw no reliance by New York on previous rules in *Winship*. It traced almost 100 years of cases in which it had "assumed that proof of a criminal charge beyond a reasonable doubt is constitutionally required." *In re Winship, supra* at 362. It considered *In re Gault*, 387 U.S. 1 (1967) as an express rejection of the notion that the Due Process Clause was inapplicable to juvenile proceedings. *In re Winship, supra* at 365. *Winship*, furthermore, involved a juvenile proceeding. Its impact, consequently, on the administration of justice in New York would obviously be less than a rule which applies to all homicide cases.

The jury instructions here under attack are based upon rules which have been firmly with us for over one hundred years. Retroactive application of *Mullaney* in this State would, furthermore, have the same sort of affect, recognized in *Tehan*, as *Griffin* retroactivity would have had in California and other jurisdictions. As of June 30, 1975, there were 269 inmates in prison in this State who had been convicted of first degree murder serving sentences of life imprisonment or awaiting execution, and 728 inmates in prison having been convicted of second degree murder serving sentences ranging from two years to life. State Correctional Statistical Abstract for the Second Quarter, 1975. If *Mullaney* is to be applied retroactively new trials might have to be awarded in many cases decades old.

A number of other jurisdictions would, we believe, be similarly affected. In the following seven jurisdictions the defendant has (or had) the burden to prove by a preponderance of the evidence heat of passion on sudden provocation (or "extreme emotional distress") to reduce murder to manslaughter: *Delaware, Fuentes v. State*, 18 Crim. Law Rptr. 2153 (Del. Oct. 14, 1975) ; *Hawaii,* (*Mullaney* would probably affect cases in which the appeal was finally determined prior to August 27, 1971. *Compare State v. Santiago*, 53 Haw. 254, 492 P. 2d 657 (1971) *with State v. Cuevas*, 53 Haw. 110, 488 P. 2d 322 (1971) ) ; *Maine, Mullaney v. Wilbur, supra; Maryland, Wilson v. State*, 261 Md. 551, 276 A. 2d 214 (1971) ; *Wilson v. State*, 28 Md. App. 168, 343 A. 2d 537 (1975) ; *Burko v. State*, 19 Md. App. 645, 313 A. 2d 864 (1974) vacated 422 U.S. 1003, 95 S.Ct. 2624 (1975) ; *Massachusetts, Comm. v. Johnson*, _____ Mass. App. _____, 326 N.E. 2d 355 (1975) restating the rule of *Comm.*

*v. York,* 50 Mass. (9 Met.) 93 (1845) ; *Cf. Comm. v. Gagne,* _____ Mass. _____, 326 N.E. 2d 907, 910 (1975) ; *New York, People v. Balogun,* 372 N.Y.S. 2d 384 (N. Y. Supreme Ct. Kings County 1975) ; *Tennessee, Hawkins v. State,* 527 S.W. 2d 157 (Tenn. App. 1975). If, as we believe, *Mullaney* prohibits requiring the defendant to prove that he acted in self-defense by a preponderance of the evidence when that issue is properly presented the following seven jurisdictions would be adversely affected: *Georgia, Chandle v. State,* 230 Ga. 574, 198 S.E. 2d 289 (1973) ; *See also Henderson v. State,* _____ Ga. _____, 218 S.E. 2d 612 (1975) (citing *Mullaney); Ohio, State v. Poole,* 33 Ohio St. 2d 18, 294 N.E. 2d 888 (1973) (for cases prior to January 1, 1974, the effective date of Ohio Rev. Code Ann. § 2901.05 (Page 1975) which probably corrects Ohio law) ; *Pennsylvania, Comm. v. Cropper,* _____ Pa. _____, 345 A. 2d 645 (1975) (intimating that *Mullaney* may affect Pennsylvania) ; *Comm. v. Carbonetto,* 455 Pa. 93, 314 A. 2d 304 (1974) ; *Comm. v. Winebrenner,* 439 Pa. 73, 265 A. 2d 108 (1970) ; *Rhode Island, State v. Mellow,* 107 A. 871 (1919) ; *South Carolina, State v. Judge,* 208 S.C. 497, 38 S.E. 2d 715 (1946) ; *Texas, Parkman v. State,* 149 Tex. Cr. 101, 191 S.W. 2d 743 (1945) (at least in cases tried before January 1, 1974, the effective date of the new Texas Penal Code §§ 2.03, 9.02, 9.31 (Vernon 1974), which probably corrects Texas law in this respect) ; *West Virginia, State v. Collins,* 154 W. Va. 771, 180 S.E. 2d 54 (1971).

Retroactive application of *Mullaney* requiring retrials in homicide cases years old in at least fifteen jurisdictions would, we believe, have on the administration of justice in this country a devastating impact.

We concede that the purpose of the *Mullaney* rule, to insure a reliable determination of the question of guilt, or the degree of guilt, weighs in favor of retroactivity. Yet the Supreme Court has recognized that "the extent to which a condemned practice infects the integrity of the truth-determining process at trial is a question of probabilities." *Williams v. United States,* 401 U.S. 646, n. 7 (1971) ; *Stovall v. Denno, supra.* While in *Winship* there could be no question that the standard of proof employed was determinative on the issue of guilt, *In re Winship, supra,* n. 2, whether the jury instructions condemned in *Mullaney* and even more clearly those under attack here would in the final analysis be so determinative to a jury so instructed is a matter of pure speculation.

We note that both cases from other jurisdictions which have so far considered the question, have determined that *Mullaney* should not be given retroactive effect. *Fuentes v. State, supra* (Delaware) ; *People v. Balogun, supra* (New York).

For the reasons given, in the trial we find

No error.

Justice LAKE concurring in result.

It is elementary that a decision of the Supreme Court of the United States interpreting the Constitution of the United States is binding upon this Court and, although we may believe it to be erroneous, we must give it full effect in cases coming before us. It is equally elementary that a decision of a court of last resort, declaring or interpreting a rule of law, is retroactive and applies to all cases thereafter to be decided, irrespective of when they arose, unless the court which rendered that decision declares otherwise. This is more clearly true when there has been no prior conflicting decision by that court. This Court does not have authority to declare a decision of the Supreme Court of the United States non-retroactive. In the silence of that Court on that question a decision by it, interpreting the Due Process Clause of the Fourteenth Amendment, gives to that clause the meaning so declared just as if the interpretation had been expressly written into it at the time the Amendment was ratified.

To hold, as the majority opinion does, that *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. _ _, 44 L.Ed. 2d 508, declares that the instruction given the jury in the case now before us, violates the Due Process Clause of the Fourteenth Amendment, but that we will, nevertheless, refuse to order a new trial is for this Court to deny to this defendant his right under the United States Constitution. I agree that to give *Mullaney v. Wilbur, supra,* retroactive effect and to hold that it declares the instruction in question is contrary to the Due Process Clause of the Fourteenth Amendment would be disastrous, for such ruling would require a new trial, not only for this defendant, but for an unknown number, perhaps hundreds, of prisoners now serving sentences for murders of which this Court has held they were lawfully convicted. The practical effect would be to release most of these convicted murders upon society, since loss of witnesses, due to the passage of time, would, in most instances, pre-

vent conviction upon a retrial. This disaster can be averted if the Supreme Court of the United States declares *Mullaney v. Wilbur, supra,* to be non-retroactive, a consummation devoutly to be desired, but this Court has no authority so to declare and, as of this date, the Supreme Court of the United States has not done so.

There is a way, however, whereby this Court can avoid this disastrous result and, in my opinion, should do so. That is to hold, as I believe is correct, that *Mullaney v. Wilbur, supra,* does not declare the instruction given to the jury by the Superior Court in Hankerson's case a violation of the Due Process Clause. If that be true, Hankerson is not entitled to a new trial and the majority opinion has reached the correct result for the wrong reason.

This is the instruction in question:

"Under our system, when a person is charged with a crime and he pleads not guilty he does not have to prove that he is innocent, he is presumed innocent, and the *burden of proof is on the State to prove beyond a reasonable doubt that he is guilty* before you can find him guilty.

\*   \*   \*

"I charge that for you to find the defendant guilty of second degree murder [the crime with which Hankerson was charged and of which he stands convicted], *the State must prove two things beyond a reasonable doubt* \* \* \* that the defendant intentionally *and without justification* or excuse and *with malice* shot Gregory Ashe with a deadly weapon. *Malice* \* \* \* *means that condition of mind which prompts a person* to take the life of another intentionally, *or to intentionally inflict a wound with a deadly weapon upon another which proximately results in his death without just cause, excuse or justification.*

\*   \*   \*

"In order to reduce the crime from second degree murder to manslaughter, *the defendant must prove* not beyond a reasonable doubt but *simply to your satisfaction* that there was no malice on his part. And in order to excuse his act altogether on the grounds of self defense, *the defendant must prove* not beyond a reasonable doubt but *simply to your satisfaction* that he acted in self defense.

State v. Hankerson

\* \* \*

"So I charge you, Ladies and Gentlemen, *if you find* from the evidence and *beyond a reasonable doubt* that on or about September 29, 1974, *the defendant*, Johnnie B. Hankerson, *intentionally and with malice* and *without justification or excuse* [i.e., not in self defense] shot Gregory Ashe with a deadly weapon, thereby proximately causing Gregory Ashe's death, nothing else appearing, it would be your duty to return a verdict of guilty of second degree murder. *However, if you* do not so find, or *have a reasonable doubt as to one or more of these things,* you will not return a verdict of guilty of second degree murder." (Emphasis added.)

By this instruction the trial judge put squarely upon the State the burden to prove *beyond a reasonable doubt* every element of second degree murder, namely: (1) The defendant shot Ashe; (2) he thereby proximately caused Ashe's death; (3) he shot Ashe with malice (i.e., intentionally and with a deadly weapon); (4) he shot Ashe without justification or excuse (i.e., not in self defense).

Clearly, if this were all that the jury was told, the rule of *Mullaney v. Wilbur, supra,* would be fully satisfied. But, says the majority, this is not all they were told. They were also told that to reduce the offense to manslaughter the defendant must prove *to the jury's satisfaction* he did not shoot Ashe with malice, and to excuse the killing entirely on the ground of self defense, the defendant must prove *to the jury's satisfaction* that he killed Ashe in self defense, the elements of which were correctly defined.

At first glance it seems inconsistent and contradictory to instruct the jury that the State has the burden to prove beyond a reasonable doubt the presence of malice and absence of the justification of self defense and the defendant has the burden of proving *to the satisfaction of the jury* the absence of malice or the presence of the justification of self defense. This Court has, however, held to the contrary many times, the harmonizing factor lying in the meaning of the term "to the satisfaction of the jury."

In *State v. Freeman,* 275 N.C. 662, 666, 170 S.E. 2d 461, Justice Sharp, now Chief Justice, speaking for a unanimous Court, said:

> "These cases [citations omitted] enunciate and reiterate the rule—established in our law for over one hundred years, *State v. Willis,* 63 N.C. 26 (1868)—that when the burden rests upon an accused to establish an affirmative defense or to rebut the presumption of malice which the evidence has raised against him, the *quantum* of proof is to the satisfaction of the jury—not by the greater weight of the evidence nor beyond a reasonable doubt—*but simply to the satisfaction of the jury."*

In Stansbury, North Carolina Evidence (Brandis Revision), § 214, it is said that proving the presence of self defense or the absence of malice "to the satisfaction of the jury" does not require a showing "by the greater weight of the evidence."

If the defendant can satisfy this requirement by less than the "greater weight" of the evidence; that is by less persuasive, less convincing evidence than would be sufficient to tip the scales ever so slightly in his favor, how can it be said that the burden *of proof* "has been put upon him?" The burden of proof is the *burden* to persuade the mind, to convince. A burden less than this can only be a burden to establish a reasonable, rational doubt. Thus, there is no inconsistency in telling the jury that, to convict the defendant of second degree murder, the State must prove presence of malice and absence of justification (self defense) beyond a reasonable doubt and, although the State has proved, beyond a reasonable doubt, an intentional killing with a deadly weapon, the defendant must be acquitted of that charge if he has *satisfied* the jury of the absence of malice or the presence of justification (self defense).

Admittedly, the jury cannot be expected to know what this Court has said proof "to the satisfaction of the jury" does not mean. The question is whether the jury could have been misled by what the trial judge told them in his charge *in this case.* As above stated, he clearly and unequivocally told the jury they must find the defendant not guilty of second degree murder unless the State had proved *beyond a reasonable doubt* every element of that crime, including the presence of malice and the absence of justification (self defense). In my opinion, the jury which found this defendant guilty of second degree

murder could not have been confused about this, and the charge
of the court, which is a correct statement of the law of this
State, did not in any way place upon the defendant a burden
of proof forbidden by the Due Process Clause of the Fourteenth
Amendment as now construed in *Mullaney v. Wilbur, supra.*
I, therefore, concur in the majority's conclusion that this de-
fendant is not entitled to a new trial.